# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| SHELIA L. HODGES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:10-CV-00804-NKL |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |
| ) | |

## ORDER

Before the Court is Plaintiff Shelia Hodges' Social Security Complaint [Doc. # 5]. For the following reasons, the Court affirms the decision of the Administrative Law Judge ("ALJ").

## I.  Background[1]

This suit involves Plaintiff's application for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401, et seq. On February 12, 2009, following a hearing, an ALJ found that Plaintiff was not under a "disability" as defined in the Act. Plaintiff appeals from that decision.

### A.  Medical Evidence

On November 15, 2005, Plaintiff saw Lynn DeMarco, M.D., at Truman Medical Center West. Dr. DeMarco noted Plaintiff's rheumatoid arthritis was active and laboratory results showed that her medication, methotrexate, was undetectable.

---

[1] The facts and arguments presented in the parties' briefs are duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

Six months later, Plaintiff saw William Rees II, M.D., for possible sleep apnea on April 11, 2006. He noted Plaintiff had a history of symptoms, including large neck, snoring and difficulty staying awake. Plaintiff's rheumatoid arthritis was "stable." [Tr. 124]. During the physical examination, Plaintiff was able to walk without assistance and appeared comfortable and denied musculoskeletal symptoms, decreased range of motion, joint pain, joint stiffness, joint swelling, joint warmth, shortness of breath, neck pain or stiffness, edema, and changes in activities of daily living.

On July 13, 2006, Plaintiff saw Courtney Langdon, M.D., for "possible obstructive sleep apnea." [Tr. 118]. Plaintiff denied symptoms suggestive of narcolepsy and reported her snoring woke her in the night. Dr. Langdon ordered an overnight sleep study. During a neurologic examination, the physician noted a normal gait and normal strength.

On August 28, 2006, Plaintiff underwent a sleep study and was diagnosed with mild obstructive sleep apnea with sleep disruption. Sleep quality was improved and Plaintiff experienced no sleep disruptions (apnea-hypopnea) with the initiation of a bi-level positive airway pressure machine (BiPAP). Dr. Langdon recommended the BiPAP for home use.

On October 26, 2006, Plaintiff saw Dr. DeMarco for reevaluation of rheumatoid arthritis. Plaintiff complained of joint pain, swelling in her right wrists, low back pain, and dizzy spells. Dr. DeMarco concluded that Plaintiff had rheumatoid arthritis in partial remission on methotrexate, osteoarthritis of the low back without evidence of

radiculopathy, sleep apnea, and obesity. Plaintiff was told to continue her methotrexate and prednisone and return in three months.

On October 27, 2006, Plaintiff reported her sleep apnea was improved with the use of the BiPAP, and she was not napping anymore. The nurse told Plaintiff to return to the clinic in six months.

On January 8, 2007, x-rays of Plaintiff's right wrist showed only degenerative changes in the carpal bones and distal radius and soft tissue swelling in the hand and wrist.

Six months after her last appointment, Plaintiff returned to the Pulmonary Clinic for a follow-up sleep study on February 21, 2007. Under clinical observation, she experienced no sleep disruption (apnea-hypopnea) with use of the BiPAP, and its use was well-tolerated. Dr. Langdon adjusted Plaintiff's BiPAP.

On May 30, 2007, Plaintiff reported she was "doing well" aside from low back pain, right hand discomfort, and ankle swelling. [Tr. 182]. The staff physician noted all joints were non-tender, there was no edema in the ankle, and right-hand discomfort was related to the recent removal of a cyst. X-rays of Plaintiff's back showed no evidence of acute injury, normal vertebral height and alignment, neuroforaminal narrowing was suggested at L5/S1, and arthropathy at the lower lumbar spine. Plaintiff's rheumatoid arthritis was in partial remission.

On August 2, 2007, Plaintiff visited Truman Medical Center West with complaints of diarrhea and concern for trichomoniasis. She had "no other complaints." [Tr. 172]. Her extremities were normal, with no edema. She denied shortness of breath.

Also on August 2, 2007, Plaintiff had a follow-up sleep study. Under clinical observation, Plaintiff experienced no sleep disruption (apnea-hypopnea) with use of the BiPAP. The next day, Plaintiff underwent a multiple sleep latency test (MSLT). Dr. Langdon noted multiple daytime naps consistent with severe sleepiness.

On August 30, 2007, Plaintiff reported daytime sleepiness. However, there was no snoring or apnea while Plaintiff used the BiPAP. After reviewing the results of the August 3 MSLT, a staff physician noted the study was "suggestive of narcolepsy." [Tr. 162]. Plaintiff was advised to return to the clinic in six months.

On September 26, 2007, Plaintiff saw Dr. DeMarco for a follow-up appointment. He noted that she was noncompliant with her rheumatoid arthritis medication.

On April 14, 2008, Plaintiff saw Dr. DeMarco. He noted a "long absence" since she was last seen in September 2007. [Tr. 158]. "Importantly, patient has not filled her prescription . . . since September 2007." *Id.* He noted a history of sleep apnea, past diagnosis of osteoarthritis, obesity, rheumatoid arthritis with active synovitis in the right wrist, and noncompliance.

Nine months after her last appointment, Plaintiff returned to the Pulmonary Clinic on April 28, 2008. Ashraf Gohar, M.D., noted the purpose of the visit was a "followup of obstructive sleep apnea and narcolepsy." [Tr. 156]. He also noted positive for "vertigo

4

symptoms for 7 months" and scheduled Plaintiff for an appointment to see a primary-care physician for vertigo. [Tr. 157]. Dr. Gohar talked with a social worker and asked her to work with Plaintiff to obtain sleep medication, but there was no record of Plaintiff contacting the social worker or taking the medication. Dr. Gohar observed full strength (5/5) in both upper and lower extremities. Plaintiff was scheduled to return to the clinic in eight weeks.

On June 25, 2008, Plaintiff visited Truman Medical Center for a follow-up appointment after a mammogram. During the visit, she complained of edema, snoring, and joint pain. Plaintiff denied shortness of breath, joint stiffness, and decreased ranges of motion. Plaintiff was observed to walk without assistance and appeared comfortable. Plaintiff's rheumatoid arthritis was stable. Plaintiff reported daytime sleepiness and sleep apnea.

On July 16, 2008, Plaintiff visited the Truman Medical Center Family Planning Clinic with complaints of urinary incontinence. Plaintiff was prescribed Detrol for bladder control. Plaintiff reported a past medical history of sleep apnea and rheumatoid arthritis and described lower back pain that was relieved with Motrin.

On December 1, 2008, Plaintiff saw Dr. DeMarco for reevaluation of her rheumatoid arthritis, "primarily affecting the right wrist." [Tr. 138]. Plaintiff stated she was doing "fairly well" on the methotrexate and gave herself a weekly injection. *Id.* She reported that she also took prednisone and "occasional" ibuprofen. *Id.* Dr. DeMarco noted swelling in the right metacarpal joint, but related it to a surgical scar. Her

5

neurological examination was normal. The physician noted rheumatoid arthritis in partial remission and obesity.

On December 19, 2008, Plaintiff returned to Truman Medical Center West for a general examination. She reported wrist and back pain, which she attributed to rheumatoid arthritis that was "unstable." [Tr. 137]. Upon examination, Plaintiff was able to walk without assistance and appeared comfortable. Plaintiff reported having sleep apnea, and she was referred to the Pulmonary clinic for a BiPAP adjustment.

### B.     Administrative Hearing

At her administrative hearing on January 26, 2009, Plaintiff testified that she was unable to work because of rheumatoid arthritis and carpal tunnel syndrome in the right hand which caused cramping, tightening, and weakness. Plaintiff testified that some days she could not do anything because of her weak wrists, and that she could hold a pen only long enough to sign her name and address. She also testified to stiffness in her back and arms and swollen ankles. Plaintiff further testified that she could stand for two minutes, walk one and one-half blocks, and sit for less than 30 minutes, and that she had shortness of breath on any kind of exertion.

A vocational expert, Lesa Keen, also testified at the hearing. The ALJ posed a hypothetical to Ms. Keen, assuming an individual who could perform light work, including standing and walking six hours in an eight-hour workday and sitting six hours in an eight-hour workday, with occasional performing of posturals, but with no frequent twisting of the right wrist and no frequent very hard grasping bilaterally. [Tr. 33]. The

vocational expert testified that such an individual would be able to perform the light, unskilled work of a cashier, photocopy machine operator, and collator operator and these jobs exist in significant numbers in the national economy.

### C. The ALJ's Decision

The ALJ found that Plaintiff had the severe impairments of "rheumatoid arthritis in full to partial remission with poor medication compliance; weight disproportionate to height at 67 inches tall with weight of approximately 248 pounds and early degenerative disc and joint disease in the lumbar spine." [Tr. 11]. The ALJ also found that Plaintiff has "sleep apnea which is controlled with a CPAP and does not constitute a severe impairment since the claimant has no significant residual limitations stemming therefrom." *Id.* The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. *Id.*; 20 C.F.R. § 404.1520(d) (2011).

The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") "to perform light work as defined in 20 CFR 416.967(b) except she cannot perform any frequent twisting of the right wrist and no frequent very hard grasping bilaterally and can occasionally perform all postural positions." *Id.*

Finally, the ALJ found that, while Plaintiff is unable to perform past relevant work, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

## II. Discussion

### A. Standard of Review

In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### B. Whether the ALJ's Determination Regarding Plaintiff's Credibility is Supported by Substantial Evidence

Plaintiff argues that the ALJ erred in considering Plaintiff's noncompliance with treatment when assessing Plaintiff's credibility. Specifically, Plaintiff claims the ALJ "erred by failing to follow Social Security Ruling 82-59 when evaluating Plaintiff's failure to follow the prescribed treatments to determine her credibility." [Doc. # 13, at 11].

Social Security Ruling 82-59 applies only "to claimants who would otherwise be disabled within the meaning of the Act; it does not restrict the use of evidence of noncompliance for the disability hearing." *Holley v. Massanari*, 253 F.3d 1088, 1092

(8th Cir. 2001) (holding Social Security Ruling 82-59 does not restrict use of evidence of noncompliance, but rather delineates reasons the Administration may deny benefits to otherwise disabled persons due to noncompliance). An ALJ may consider a plaintiffs' "noncompliance with treating physician's directions, including failure to take prescription medications . . . ." *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006).

Here, the ALJ did not find that Plaintiff was disabled, nor did he deny benefits to Plaintiff solely due to noncompliance with medication. Social Security Ruling 82-59 is therefore not applicable. Instead, the ALJ properly used Plaintiff's noncompliance as a factor in his analysis of Plaintiff's credibility. Substantial evidence supports the ALJ's determination of Plaintiff's credibility, including, inter alia, Plaintiff's poor work record, daily activities, recent work on a political campaign, and inconsistences between Plaintiff's allegations of physical limitations and the objective medical evidence.

For the reasons stated above, Plaintiff's first argument pertaining to the Social Security Ruling 82-59 fails.

### C. Whether the ALJ Properly Analyzed Plaintiff's Medically Determinable and Non-severe Impairments

Plaintiff next argues the ALJ erred (1) by finding no medically determinable physical impairment of sleep apnea, narcolepsy and vertigo, and (2) in finding that Plaintiff had non-severe sleep apnea in step two of the sequential evaluation process. The Commissioner has established a five-step sequential evaluation process used to decide if a claimant is disabled, the first two of which are relevant here. 20 C.F.R. § 404.1520

(2011). At the first step, the ALJ determines if a claimant is "doing substantial gainful activity . . . ." 20 C.F.R. § 404.1520(a)(1)(i) (2011). The second step considers the medical severity of claimant's impairments. 20 C.F.R. § 404.1520(a)(1)(ii) (2011). Absent an "impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities," there is no severe impairment, and the claimant therefore is not disabled. 20 C.F.R. § 404.1520(c) (2011).

### i. Whether the ALJ Erred by Finding no Medically Determinable Physical Impairments of Narcolepsy and Vertigo

In step one of the sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since November 3, 2006. [Doc. # 9, Ex. 3, at 12]. The ALJ then proceeded to step two, where he determined that Plaintiff has the severe impairments of (1) rheumatoid arthritis in full to partial remission with poor medication compliance, (2) weight disproportionate to height at 67 inches tall with weight of approximately 248 pounds, and (3) early degenerative disc and joint disease in the lumbar spine. [Tr. 11]. Plaintiff contends that the ALJ improperly failed to acknowledge her narcolepsy and vertigo as severe impairments.

Plaintiff claims that she has the medically determinable impairments of narcolepsy and vertigo, and was diagnosed therewith by her treating physicians at Truman Medical Center. However, Plaintiff did not allege in her application for benefits or at the administrative hearing that she had narcolepsy and vertigo. [Tr. 76, 16-35]. The ALJ does have a duty to fully develop the record, but he "is not obliged to investigate a claim

not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008).

Because Plaintiff did not allege disability due to narcolepsy and vertigo, nor cite any authority requiring the ALJ to investigate impairments not alleged, the ALJ was not obligated to investigate them and therefore committed no error by failing to do so.

### ii. Whether the ALJ Erred in Finding Plaintiff had Non-severe Sleep Apnea in Step Two of the Sequential Evaluation Process

The ALJ said "that the claimant does have sleep apnea which is controlled with a CPAP and does not constitute a severe impairment since the claimant has no significant residual limitations stemming therefrom." [Tr. 11]. Plaintiff alleges that the ALJ erred at step two of the sequential evaluation process in finding that her sleep apnea was non-severe.

Severe impairments significantly limit a claimant's physical or mental ability to do basic work activities, regardless of age, education, and work experience. 20 C.F.R. § 416.920(c). Basic work activities are the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521. Basic work activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," as well as "understanding, carrying out, and remembering simple instructions." 20 C.F.R. § 404.1521(b)(1)-(6) (2011). When an "impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004).

Here, the ALJ found Plaintiff's sleep apnea was "controlled with a CPAP." This finding is adequately supported in the record. [Tr. 111, 115, 175, 189]. The ALJ's decision concerning the severity of Plaintiff's sleep apnea was well supported by substantial evidence in the medical record.

### D. Whether the ALJ Properly Considered Plaintiff's Obesity

Plaintiff next alleges that the ALJ erred in failing to properly evaluate the effect of her obesity, as required by Social Security Ruling 02-1p, when he made his RFC findings. An ALJ is required to consider obesity in determining whether the claimant's impairments meet or equal the requirements of a listed impairment. SSR 02-1p, 67 Fed. Reg. 57859, 57861 (Sept. 12, 2002).

When the ALJ "references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal." *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009). Here, the ALJ found Plaintiff's obesity was a severe impairment at step two of the sequential evaluation process. [Tr. 11]. Moreover, the ALJ specifically referred to Plaintiff's obesity, noting "that she was 67 inches tall with a weight of approximately 245 pounds . . . ." [Tr. 13]. Further, Plaintiff's RFC is consistent with the findings of the State Medical Consultant, Dr. Timothy Link, whose physical RFC assessment specifically considered Plaintiff's obesity. [Tr. 127-131].

Because the ALJ specifically referenced Plaintiff's obesity, and because his decision is well supported by the medical record, the Court will not reverse his decision on this ground.

### E. Whether the ALJ Properly Determined Plaintiff's RFC

Finally, Plaintiff argues that the ALJ committed reversible error by arbitrarily determining a RFC which was not based upon all of the medical evidence and by not fully explaining the basis of his determination as required by Social Security Ruling 96-8p. "The RFC assessment must be based on *all* of the relevant evidence in the case record . . . ." SSR 96-8p, 61 Fed. Reg. 34474, 34477 (July 2, 1996) (emphasis in original). In his decision, the ALJ is required to include a "narrative discussion describing how the evidence supports each conclusion," and also explaining "how any material inconsistencies or ambiguities in the evidence" were resolved. *Id.* at 34478.

Specifically, Plaintiff complains that the ALJ failed to provide a proper explanation for why his RFC differed from the assessment done by the agency's consulting physician, Dr. Link, on November 29, 2006. Plaintiff describes the ALJ's decision as a "rejection" of the RFC assessment performed by Dr. Link. [Doc. # 13, at 21]. However, as explained above, the RFC is based upon all relevant evidence, not just the assessment provided by the agency's doctor. In fact, the RFC determined by the ALJ is nearly identical to Dr. Link's assessment, with the exception of the limitation on the climbing of ladders, ropes, and scaffolds. *See* [Tr. 129 (RFC Assessment conducted by Dr. Link)]; [Tr. 11 (ALJ Decision)]; § 416.920(b) (physical exertion requirements of "light work"). The ALJ fully detailed his analysis in reaching his decision, which is supported by substantial evidence from the medical record. [Tr. 12-13].

Because the ALJ's decision is supported by substantial evidence on the record as a whole, the Court affirms his decision.

## III. Conclusion

Accordingly, it is hereby ORDERED that the decision of the Commissioner is AFFIRMED.

s/ NANETTE K. LAUGHREY  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 2, 2011  
Kansas City, Missouri